## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| WAYNE ANDREWS, JR. | CASE NO. 5:21-CV-01755-JRK |
| Petitioner, | JUDGE JAMES R. KNEPP II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| STATE OF OHIO, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

On August 20, 2021, Petitioner Wayne Andrews, Jr., a prisoner in state custody, filed a *pro se* petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1). The District Court has jurisdiction over the petition under § 2254(a). On November 12, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry of Nov. 12, 2021). On April 27, 2022, Respondent Ronald Erdos,[1] in his official

---

[1]     Mr. Andrews's petition named the State of Ohio as the respondent, and the petition was docketed accordingly. The federal habeas statute provides that the proper respondent to a habeas petition is "the person who has custody over [the petitioner]." 28 U.S.C. § 2242; *see also* Rule 2(a), Rules Governing Section 2254 Cases. Although the State is not the proper respondent, Mr. Andrews is proceeding *pro se*; as such, his pleadings are held to a less stringent standard than those drafted by lawyers. *McCormick v. Butler*, 977 F.3d 521, 528 (6th Cir. 2020). Because Mr. Andrews seeks release from custody, I construe his naming of the State of Ohio to include the specific warden controlling his custody. *See United States ex rel. Gauthreaux v. State of Ill. Pardon & Parole Bd.*, 447 F. Supp. 600, 602 (N.D. Ill. 1978) (construing *pro se* habeas petitions to name the warden as the respondent where habeas petitioners named the state and the parole board). Moreover, no valid purpose would be served by requiring Mr. Andrews to correct his

capacity as Warden of the Southern Ohio Correctional Facility[2] (hereinafter, the State), moved to dismiss the petition because the claims raised are non-cognizable. (ECF #8). Mr. Andrews did not respond to the State's motion.

For the reasons discussed below, I recommend the District Court **DISMISS** the petition.

PROCEDURAL HISTORY

A.      **Factual findings of the Court of Appeals**

The Ohio Court of Appeals, Ninth Appellate District, made the following factual findings on direct appeal. These findings are presumed correct unless Mr. Andrews rebuts that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

> [¶2] Late one evening, R.H. frequented two bars in Highland Square. She left the bars around 2:20 a.m. and, just after 5:20 a.m., the police discovered her passed out behind the wheel of her car at the intersection of Killian and South Arlington Roads. The police transported R.H. to the station, administered a breathalyzer, and determined that she was highly intoxicated. R.H. openly sobbed while being interviewed and mentioned several times that someone had threatened to hurt her. She also mentioned that a man had taken her keys and pushed her inside her car. The police did not press her for any details about her statements, however, as both her level of intoxication and emotional state detracted from the clarity of her

---

petition because the State has returned the writ (ECF# 6), included the proper respondent, and addressed the merits of Mr. Andrews's claims. *See Williams v. Ohio Dep't of Rehab. & Corr.*, No. 1:21-CV-01301-BYP, 2024 WL 1309420, at *12 (N.D. Ohio Mar. 12, 2024) ("It is conceivable that dismissal could be appropriate on this basis [naming the wrong respondent]. However, the Department has not raised this issue and this case has been pending for some time. Accordingly, I will proceed to consider the merits of Mr. Williams' petition."), *report and recommendation adopted*, 2024 WL 1299950 (N.D. Ohio Mar. 27, 2024); *see also Hernandez v. Commonwealth*, 234 F. Supp. 3d 316, 322 (D. Mass. 2017) (holding improvident to dismiss *pro se* petition naming the wrong respondent where the warden was within the jurisdiction of the court, would be represented by the same counsel, and the error may only be remedied by amending the petition).

[2]      Mr. Andrews was incarcerated at the Richland Correctional Institution at the time of filing his habeas petition. He has since moved to the Southern Ohio Correctional Institution.

statements. Once the officers finished questioning her, they made sure she had a ride home and impounded her car.

[¶3] Later in the evening that same day, R.H. contacted the police to report that a man had attacked her when she left the bars at Highland Square. She ultimately reported that the man had followed her to her car, taken her keys, driven her around against her will, and forced her to perform oral sex. She recalled waking up on a couch in an unfamiliar house with no memory of exiting her car or being brought inside. She further recalled grabbing her scattered belongings, going outside, finding her car, and driving off. Finally, she recalled being woken by the police when they found her passed out behind the wheel.

[¶4] R.H. did not know the name of the man who attacked her and was only able to provide the police with limited details about his appearance. She submitted to a sexual assault examination, however, and male DNA was discovered on her arms, on her neck, and on a beer bottle the police found inside her car. Forensic analysts then searched a law enforcement database for matching profiles and determined that Mr. Andrews could not be excluded as the source of the DNA they had discovered. After speaking with him and investigating further, the police arrested him in connection with R.H.'s abduction.

[¶5] A grand jury indicted Mr. Andrews on one count of kidnapping, one count of rape, three counts of abduction, and two counts of sexual battery. The State dismissed one abduction count before trial, and the remaining counts were tried to a jury. After extended deliberations, the jury returned a partial verdict. It found Mr. Andrews not guilty of kidnapping, guilty of two counts of abduction, and guilty of one count of sexual battery. It was unable to reach a verdict on the remaining counts of rape and sexual battery. Those counts were later dismissed at the State's request.

[¶6] The trial court sentenced Mr. Andrews to five years in prison on his sexual battery count and three years in prison on each of his abduction counts. It ordered the prison term on his sexual battery count to run consecutively with the prison term on one of the abduction counts. It ordered the prison term on the remaining abduction count to run concurrently with that sentence. Consequently, Mr. Andrews received a total sentence of eight years in prison.

. . .

[¶10] R.H. testified that she drove herself to Highland Square late one evening to frequent two bars where she knew either the bartender or the manager. She parked on a side street off a back alley to the bars and estimated that she arrived at the first bar around 11:30 or 11:45 p.m. She indicated that she ordered two shots and a beer at the first bar before walking over to the second bar and ordering two mixed drinks. She shared at least one of the drinks with a friend and spent time socializing with a

few people at each bar while she enjoyed her drinks. After closing her tab at the second bar, she returned to the first bar and stayed a bit longer before deciding it was time to leave. Realizing that she had consumed too many drinks to drive, she tried calling a friend who lived nearby to see if she could walk to his house. The friend did not answer, however, so R.H. decided she would sleep in her car for a while. She then exited through the back door of the bar, took out her keys, and walked through the back alley towards her car.

[¶11] R.H. testified that, as she was walking to her car, a man came up behind her and snatched her keys from her hand. The man demanded that she get into her car, and R.H., who was terrified, entered the car and slid over to the passenger's side. Recordings from two cameras facing the alley behind the bars captured R.H. walking to her car, and the State introduced those recordings during its case-in-chief. The recordings depicted R.H. leaving the bar at 2:23 a.m. They showed a man walking several feet behind her and quickly closing the gap between them as he followed her. They further showed the man pulling even with her just as she walked past the corner of a building and disappeared from view.

[¶12] R.H.'s memories of the remainder of her evening were fragmented. She recalled the man driving her around in circles for a long while as she pleaded to be let go. She recalled breaking her special keychain (*i.e.*, a Pokémon ball) when she unsuccessfully tried grabbing for her keys. She recalled trying to use her cell phone more than once and the man either smacking it from her hand or slamming on the brakes, causing her to hit her forehead on her dashboard. She also recalled him pouring a beer on her and repeatedly calling her a "crazy, stupid, drunk bitch." R.H. testified that she carried a knife in her purse whenever she went out alone. She remembered removing the knife from her purse and unsheathing it to try to deter the man. The man took the knife from her, however, and R.H. could not remember what happened to it after he did so.

[¶13] R.H. testified that, at some point, the man pulled to the side of the road and forced her to perform oral sex. She explained that she did not try to escape when the car stopped because she did not know where they were and was too scared. She described how the man grabbed the back of her neck and pulled her down to where he had exposed his penis. She did not know how long the oral sex lasted and stated that, after a while, everything went dark. She next recalled waking up on a small couch in a strange house. Although she was still wearing her pants and bra, her shirt had been removed and she was not wearing any shoes. R.H. testified that she found her shirt on the floor next to her, her purse scattered on a nearby table, and her keys on a counter by the door. After grabbing her things, she fled through the back door, walked around the house, and spotted her car. She then drove away. R.H. testified that, shortly thereafter, everything went dark again, and she next remembered the police waking her up.

4

[¶14] A few minutes after 5:20 a.m., Deputy Michael Conley pulled behind R.H.'s car at the intersection of Killington and South Arlington Roads. The car did not move when the light turned green, so the deputy activated his lights. He testified that the lights appeared to wake the driver, who then pulled off to the side of the road. Upon his approach, the deputy found R.H. behind the wheel. He testified that she was crying, extremely upset, and noticeably intoxicated. As to the latter, he stated that she was emitting a strong odor of alcohol, slurring her speech, and making little sense. After she failed the field-sobriety tests, he administered at the scene, he took her to the police station and had her car towed.

[¶15] Deputy Conley testified that R.H. took a breathalyzer at the police station and the test revealed that her blood alcohol content was more than three times the legal limit. He confirmed that she remained extremely upset throughout their interview, even after he told her that she would be released. The State played R.H.'s recorded interview for the deputy and, upon review, he agreed that she had said a few things about someone taking her keys and threatening to hurt her. Yet, it was not his opinion that she had been trying to tell him something important. The deputy testified that it was difficult for him to understand R.H. and "it just sounded like she was mumbling and blubbering" in the manner of intoxicated individuals. He stated that R.H. never said who had hurt her and, when he asked where she had been for the last few hours, she had said she was with friends. Believing that she was simply intoxicated, the deputy released her at the conclusion of their interview.

[¶16] R.H. testified that she spoke with her mother later that evening, and her mother convinced her to report the sexual assault. She then called the police, and a detective came to her home to take her statement and transport her to the hospital for an exam. The attending physician and the sexual assault nurse examiner who met with R.H. both testified. The physician indicated that R.H. arrived at 10:09 p.m. and reported that an unknown man had forced her into her car, had driven her to an unfamiliar area, and had forced her to perform oral sex on him. The physician noted that R.H. had a bruise to her right forehead and an abrasion on her right arm. R.H. did not have any other visible injuries, but the nurse examiner testified that sexual assaults commonly occur without injury. The nurse examiner stated that R.H. was tearful throughout their interview, as she described how she was abducted and sexually assaulted. She testified that they took a urine sample from R.H. because R.H. did not believe that she had consumed enough alcohol to warrant her level of intoxication and the blackout periods she had experienced. Though R.H. did not test positive for the drug commonly associated with sexual assaults (*i.e.*, GHB), the attending physician testified that the drug is undetectable after about four to six hours. By the time R.H. was tested, a much longer time period had elapsed.

[¶17] Several witnesses testified regarding the observations they made about R.H. while she was at the bars at Highland Square. The manager of the first bar, who was R.H.'s long-time friend, recalled serving her roughly three drinks while she was at his

5

bar. He testified that he recalled her coming to the bar, leaving at some point, and returning later that evening. He further testified that she was alone each time and did not appear to be intoxicated the last time that he saw her. The manager at the second bar was familiar with R.H. as a regular customer and recalled serving her two drinks that evening. The DJ at that same bar was a good friend of R.H.'s and testified that she chatted with him that evening and did not appear to be intoxicated. Both the manager and the DJ at the second bar were familiar with Mr. Andrews, as he often sang karaoke there on Monday evenings. The manager recalled Mr. Andrews being at the bar that night, but never saw him talking to R.H. Likewise, the DJ never saw R.H. and Mr. Andrews together.

[¶18] Detective Brian Breeden became the lead investigator in this matter once the Summit County Sheriff's Department inherited the investigation. As part of his investigation, the detective secured three video-recordings of interest. Two of the recordings, previously discussed herein, depicted R.H. leaving the bars at 2:23 a.m. and a man pursuing her from behind. The third recording depicted the sidewalk in front of the bars. It showed a man walking into view at 1:38 a.m. and approaching two females who were standing outside. One of the females appeared visibly intoxicated, and, as she stumbled around, the man approached her and attempted to lead her away. The other female then repeatedly attempted to separate the two by inserting herself between the man and her intoxicated friend. Once the second female succeeded in separating her friend from the man, she led her friend away. The man then briefly looked at his cell phone before entering the bar at 1:48 a.m. Detective Breeden testified that the man depicted in the third recording was the same one who followed R.H. into the back alley 35 minutes later (*i.e.*, Mr. Andrews).

[¶19] Because R.H.'s car was impounded upon her arrest, Detective Breeden was able to have it towed to the crime lab for processing. Inside the car, the police found R.H.'s purse and, inside the purse, they found a knife sheath. No knife was found inside the car, but the police did find a little ball keychain that appeared to have been broken off. They also found a Miller High Life beer bottle, which they sent to the Bureau of Criminal Investigation ("BCI") for testing.

[¶20] Forensic analysts from BCI swabbed the beer bottle found in R.H.'s car. They also received the swabs taken during her sexual assault exam. The analyst who tested those items testified that the swabs taken from the back of R.H.'s neck, her right forearm, and her left forearm all contained a mixture of two DNA profiles. The first profile was consistent with R.H.'s profile, and the second was consistent with Mr. Andrews' profile. Likewise, swabs taken from the outside and mouth of the beer bottle contained two profiles that were consistent with R.H.'s profile and Mr. Andrews' profile. Detective Breeden testified that it was the DNA results that allowed him to identify Mr. Andrews as a person of interest.

[¶21] Detective Breeden spoke with Mr. Andrews three times during his investigation. Their first conversation took place over the phone and occurred eight weeks after R.H.'s abduction. Their second conversation also took place over the phone and occurred about two weeks later. Finally, their third conversation occurred one day after that, at the police station, following Mr. Andrews's arrest.

[¶22] Detective Breeden indicated that Mr. Andrews did not remain consistent when recounting the details of his evening on the night in question. Mr. Andrews initially told the detective that he had been living in California for the last sixth months and had not even been to Ohio. When the detective told him there was a video-recording placing him at the scene, however, Mr. Andrews recalled that he had been to Highland Square, but had left with a friend, B.C., around midnight. He recalled being introduced to a girl at the bar, but he denied taking her car or engaging in any inappropriate touching.

[¶23] After Detective Breeden informed Mr. Andrews that his DNA had been found on R.H., Mr. Andrews remembered her. He claimed that she had used a different name to introduce herself, but he accurately described her appearance and her car. Mr. Andrews told the detective that R.H. sat on his lap at the bar and they kissed, but he denied any additional physical contact. He described R.H. as extremely intoxicated and said that she either snorted some type of narcotic or took some type of a pill at the bar. Nevertheless, he claimed that he then accepted a ride from her because they were both ready to leave at the same time. He stated that R.H. drove and he quickly became concerned for his safety as a result of her erratic behavior. He described how she pulled out a knife out at one point and told him she had used it to cut people. According to Mr. Andrews, he began taking videos of R.H. with his phone in case something happened to him. Mr. Andrews was never able to provide the detective with those videos, however, as he said he had taken them on his old phone and could not retrieve them. When asked about the beer bottle the police found in the car, Mr. Andrews claimed that it belonged to R.H. and that he never drank beer.

[¶24] Late during his second interview, Mr. Andrews admitted that he drove R.H.'s car for a short while. He claimed that they stopped at a gas station, and he got out of the car because R.H. was driving so erratically and waving around her knife. He claimed that he took the knife from her and disposed of it somewhere in that area. He then convinced her to let him drive for a while so that he could safely arrive at his destination. According to Mr. Andrews, he drove the car to a spot near the intersection of Arlington and East Market Streets before he got out, walked for a bit, and got an Uber to take him to his friend P.Y.'s house. During his final interview, he stopped altogether denying that he and R.H. engaged in oral sex in the car. Instead, he indicated that he could not say whether the oral sex had occurred because he too had been drinking and things were blurry. He did state several times, however, that R.H. was the one who came on to him.

7

[¶25] Detective Breeden spoke with Mr. Andrews' friend, P.Y., but she was unable to confirm that he came to her house that evening. The detective also was unable to confirm that Mr. Andrews had been at a gas station with R.H. He testified that he watched all the available recordings from that gas station around the times Mr. Andrews possibly could have been there, but none of the recordings showed him, R.H., or her car. Further, the detective was unable to find any record of Mr. Andrews having ordered an Uber at the time he claimed to do so. The only Uber that Mr. Andrews ordered that morning was at 6:17 a.m., almost one full hour after the police found R.H. in her car.

(ECF #6 at PageID 27-32; *see also State v. Andrews*, No. 29260, 2020 WL 2060616, at *1-5 (Ohio Ct. App. Apr. 29, 2020), *appeal not allowed*, 151 N.E.3d 643 (Ohio 2020) (table)).

**B.  Trial court proceedings**

On December 21, 2017, a Summit County Grand Jury returned an indictment against Mr. Andrews, charging him with kidnapping in violation of Ohio Revised Code § 2905.01(A)(4), rape in violation of Revised Code § 2907.02(A)(2), and abduction in violation of Revised Code § 2905.02(A)(1). (ECF #6-1 at PageID 59-60). He was arraigned on December 29, 2017 and pled not guilty. (*Id.* at PageID 62).

On May 2, 2018, a Summit County Grand Jury returned Supplement I to the Indictment. (*Id.* at PageID 64-65). Mr. Andrews was charged with abduction in violation of Revised Code § 2905.02(A)(2) and two counts of sexual battery in violation of Revised Code §§ 2907.03(A)(1) and (A)(2). (*Id.*). He was arraigned on these charges on May 10, 2018 and again pled not guilty. (*Id.* at PageID 62).

On August 27, 2018, a Summit County Grand Jury returned Supplement II to the Indictment. (*Id.* at PageID 64-65). Mr. Andrews was charged with abduction in violation of Revised Code § 2905.02(A)(2). He was arraigned on this charge on September 3, 2018 and again pled not guilty. (*Id.* at PageID 62).

8

Count Four, the abduction charge from Supplement I, was dismissed by the State. (*Id.* at PageID 112). Trial began on October 1, 2018 and continued until October 4, 2018. (*Id.*). On October 10, 2018, the jury advised it was unable to reach a verdict. (*Id.*). After the jury received a *Howard* charge, it returned verdicts as follows:

> Original indictment:
>> Kidnapping – not guilty
>> Rape – no verdict
>> Abduction – guilty
>
> Supplement I:
>> Sexual battery – no verdict
>> Sexual battery – guilty
>
> Supplement II:
>> Abduction – guilty.

(*Id.*). Subsequently, the State dismissed the two charges as to which the jury was unable to return a verdict. (*Id.* at PageID 115-16). On October 25, 2018, the trial court sentenced Mr. Andrews to three years' imprisonment on each abduction charge and five years' imprisonment on the sexual battery charge. (*Id.* at PageID 120). The trial court ordered the first abduction sentence and the sexual battery sentence to be served consecutively and the second abduction sentence to be served concurrently, resulting in an aggregate sentence of eight years' imprisonment. (*Id.* at PageID 121).

## C.    Direct appeal

On December 17, 2018, Mr. Andrews filed a timely notice of appeal through new counsel to the Ninth District. (ECF #6-1 at PageID 127). Mr. Andrews raised four assignments of error in his merit brief:

> 1.    Wayne Andrews was denied his rights to due process and a fair trial by the admission of unduly prejudicial other-acts evidence, in violation of [Ohio Evidence Rules 403 and 404(B)] and the Fifth, Sixth, and Fourteenth

Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

2.  Wayne Andrews was denied his rights to due process and a fair trial by the exclusion of evidence of the victim's mental history in violation of [Ohio Evidence Rules 401 and 613] and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

3.  Wayne Andrews was denied due process because his convictions for sexual assault and abduction were against the manifest weight of the evidence in violation of the Fifth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

4.  Wayne Andrews was denied due process when the trial court imposed non-merged, consecutive sentences in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 of the Ohio Constitution.

(*Id.* at PageID 135). The State filed a merit brief in response. (*Id.* at PageID 167-217). Mr. Andrews filed a reply brief addressing all four assignments of error. (*Id.* at PageID 226-38). On April 29, 2020, the Ninth District overruled all four assignments of error and affirmed Mr. Andrews's convictions. (*Id.* at PageID 240-264; *Andrews*, , 2020 WL 2060616, at *12).

On June 15, 2020, Mr. Andrews, with assistance of counsel, filed a notice of appeal with the Supreme Court of Ohio. (*Id.* at PageID 267). In his memorandum in support of jurisdiction, Mr. Andrews set forth one proposition of law: "A Defendant in a criminal trial has fundamental Due Process and Sixth Amendment Confrontation rights to be confronted with 'other act' evidence that is presented by a witness with actual knowledge of the facts of the 'other act,' when such testimony makes any evidence more probative than unduly prejudicial." (*Id.* at PageID 274). The State opposed jurisdiction. (*Id.* at PageID 306-14). On September 1, 2020, the Supreme Court of Ohio declined jurisdiction. (*Id.* at PageID 317; *State v. Andrews*, 151 N.E.3d 643 (Ohio 2020) (table)).

10

**D.** **Petition for post-conviction relief under Revised Code § 2353.21**

On September 21, 2020, Mr. Andrews filed *pro se* an application for post-conviction relief under Revised Code § 2353.21.[3] He asserted a claim of ineffective assistance of counsel because Mr. Andrews's trial counsel failed to investigate two witnesses who were at the bar during the night R.H. was abducted and failed to investigate or obtain video evidence from a stoplight camera depicting R.H. (as opposed to him). driving the car (ECF #6-1 at PageID 337-38, 358). On February 8, 2022, the trial court denied Mr. Andrews's petition as untimely and opined that even if Mr. Andrews's petition were timely, his arguments could have been raised on direct appeal and so would be barred by the doctrine of res judicata. (*Id.* at PageID 352-59). Mr. Sanders did not further appeal that decision to the Ninth District.

### FEDERAL HABEAS PETITION

On August 20, 2021, Mr. Andrews signed his habeas petition and placed it in the prison mailing system. (ECF #1 at PageID 15). Mr. Andrews raises two grounds for relief:

> **GROUND ONE**: I, Wayne Andrews, was denied my right to due process and a fair trial by the admission of unduly prejudicial of other acts evidence in violation of the Fifth, Sixth, [and] Fourteenth Amendments of the U.S. [Constitution].

> **GROUND TWO**: I, Wayne Andrews, was denied my right to due process and a fair trial by the exclusion of evidence of the alleged victim's mental history in violation of the Fifth, Sixth, Fourteenth Amendment to the [United States] Constitution.

(*Id.* at PageID 5, 7).

---

[3]     Mr. Andrews's petition was captioned as "Petition to Vacate or Set Aside Judgment of Conviction of Sentence," which the trial court reclassified as a motion for post-conviction relief. (ECF #6-1 at PageID 354-55).

11

STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Andrews's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" and therefore acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). It "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citation and quotation omitted). Accordingly, an application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). For the purposes of § 2254(d)(1), clearly established federal law "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state-court decision is contrary to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court

12

decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Id.* at 405; *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005). The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Williams*, 529 U.S. at 405. A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision involves an unreasonable application of the Supreme Court's precedent if the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the state prisoner's case, or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *Williams*, 529 U.S. at 407. The appropriate measure of whether a state-court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Id.* at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Under § 2254(d)(2), state court factual determinations stand unless they are objectively unreasonable in light of the evidence presented in state court. *Id.* at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18. Under AEDPA, "a determination of a factual issue made by a state court shall be presumed to be correct.

[Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1).

Comity principles also require federal courts to defer to a state's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982). Federal courts must accept a state court's interpretation of its statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 596 U.S. 118, 133 (2022) (describing habeas as an "extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from providing relief on direct appeal") (cleaned up). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing *de novo* questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007).

### PROCEDURAL BARRIERS TO FEDERAL HABEAS REVIEW

Before a federal court may review a petitioner's habeas claims on the merits, the petitioner must overcome several procedural barriers. These barriers, including exhaustion of state remedies

and procedural default, limit a petitioner's access to review on the merits of a constitutional claim. *Daniels v. United States*, 532 U.S. 374, 381 (2001). Put simply, federal courts may review federal claims that were evaluated on the merits by a state court. *Bonnell v. Mitchel*, 301 F. Supp. 2d 698, 722 (N.D. Ohio Feb. 4, 2004). Claims that were not evaluated on the merits, either because they were never presented to the state courts (*i.e.*, they are unexhausted) or because they were not properly presented to the state courts (*i.e.*, they are procedurally defaulted), are generally not cognizable on federal habeas review. *Id.*

**Exhaustion of Available State Court Remedies.** A court may not grant a petition for habeas corpus unless it appears the petitioner has exhausted available state court remedies, state corrective process is unavailable, or circumstances exist rendering such state process ineffective to protect the petitioner's rights. 28 U.S.C. § 2254(b)(1). Exhaustion "affords states an 'initial opportunity to pass upon and correct alleged violations of prisoners' federal rights,'" so that federal courts do not "upset a state court conviction without giving an opportunity to the state courts to correct a constitutional violation and to do so consistent with their own procedures." *Shinn v. Ramirez*, 596 U.S. 366, 378–79 (2022) (cleaned up). Typically, the exhaustion requirement is satisfied when the petitioner fairly presents all claims to the highest court in the state in where petitioner was convicted, giving the state a full and fair opportunity to rule on the petitioner's claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A claim is fairly presented when both the factual and legal basis for the claim has been introduced to the state courts. *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2000). A failure to exhaust applies only where state remedies remain "available at the time of the federal petition." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir.

15

2006). In contrast, where state court remedies are no longer available, procedural default

(discussed more fully below), rather than exhaustion, applies. *Id.*

**Procedural Default.** Absent a petitioner demonstrating either cause and prejudice or that

failure to review the claim would result in a fundamental miscarriage of justice (discussed below), a

federal court will not consider the merits of procedurally defaulted claims. *Lundgren v. Mitchell*, 440

F.3d 754, 763 (6th Cir. 2006).

There are two avenues by which a petitioner's claim may be procedurally defaulted.

*Williams*, 460 F.3d at 806. First, procedural default occurs if a petitioner "fails to comply with state

procedural rules in presenting his claim to the appropriate state court." *Id.* To determine whether a

petitioner's failure to comply with a state procedural rule bars review of his habeas claims, courts

in the Sixth Circuit perform a four-pronged analysis: (1) whether there is a state procedural rule

applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether

the state court enforced the procedural rule; (3) whether the procedural rule is an adequate and

independent state ground on which the state can foreclose review of the federal constitutional

claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and

that he was actually prejudiced by the alleged constitutional error. *See Maupin v. Smith*,

785 F.2d 135, 138 (6th Cir. 1986).

Second, a claim may be procedurally defaulted when the petitioner fails to exhaust a claim

by raising it in state court and pursuing it through the state's "ordinary appellate review

procedures." *Williams*, 460 F.3d at 806; *see also O'Sullivan*, 526 U.S. at 848 ("Boerckel's failure to

present three of his federal claims to the Illinois Supreme Court in a timely fashion has resulted in

a procedural default of those claims"); *Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio

16

2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). As addressed above, "[i]f, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806. Although the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims, barring federal court review. *Williams*, 460 F.3d at 806; *Shinn*, 596 U.S. at 371 (holding a claim is procedurally defaulted on federal habeas review where a state prisoner has failed to first present a federal claim to the state court in accordance with state procedures and the state court would dismiss the claim on that basis).

In Ohio, the doctrine of res judicata bars review of issues that could have been raised on direct appeal but were not. *State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967). The Sixth Circuit has consistently held that Ohio's doctrine of res judicata is an adequate and independent state procedural ground on which to bar further review of a claim. *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002); *see also Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (holding that "Ohio's doctrine of res judicata as a procedural bar is regularly applied by the Ohio courts"); *Mapes v. Coyle*, 171 F.3d 408, 421 (6th Cir. 1999) (rejecting argument that Ohio's doctrine of res judicata was not firmly established and regularly followed).

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural

default; they must present affirmative evidence or argument as to the precise cause and prejudice produced. *See Lundgren*, 440 F.3d at 764. A finding of cause and prejudice does not entitle a petitioner to habeas relief; it only allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012).

A showing of cause for the default requires more than the mere proffer of an excuse. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012) (noting such objective factors include "interference by officials, an attorney error rising to the level of ineffective assistance of counsel, or a showing of a factual or legal basis for a claim that was not reasonably available."). Neither a petitioner's *pro se* status nor his ignorance of the law and procedural filing requirements are enough to establish cause to overcome procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).

To demonstrate prejudice sufficient to overcome procedural default, a petitioner must show more than mere errors in the state trial creating a possibility of prejudice; rather, the petitioner must show that the alleged errors worked to the petitioner's actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions. *Murray*, 477 U.S. at 494. There is no prejudice where the petitioner does not show a reasonable probability that the result of the proceeding would have been different. *See Ambrose v. Booker*, 801 F.3d 567, 577-78 (6th Cir. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

Alternatively, a petitioner may overcome procedural default by showing that a fundamental miscarriage of justice will occur if the claims are not considered. *Coleman*, 501 U.S. at 750; *Murray*,

477 U.S. at 495-96. A fundamental miscarriage of justice occurs in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *See Murray*, 477 U.S. at 495-96; *see also Schlup v. Delo*, 513 U.S. 298, 327 (1995) (noting a fundamental miscarriage of justice can occur where the petitioner shows it is more likely than not that no reasonable juror would vote to convict in light of newly presented evidence.). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). A valid actual innocence claim must be supported by new reliable evidence, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was not presented at trial that is so strong a court cannot have confidence in the outcome of the petitioner's trial. *Schlup*, 513 U.S. at 324. In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

**State Law Claims Not Cognizable on Federal Habeas Review.** The District Court will not have jurisdiction over a petitioner's claims for purposes of habeas corpus review if the claims do not "challenge the legality of his custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). Indeed, "[t]he writ of habeas corpus is not available to remedy errors of only state law." *Smith v. Morgan*, 371 F. App'x 575, 582 (6th Cir. 2010) (citing 28 U.S.C. § 2254(a)); *see also Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("A claim based solely on an error of state law is not redressable through the federal habeas process."); *see also Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("The Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial."); *see also Engle*, 456 U.S. at 121 n.21 ("We have long recognized that a 'mere

error of state law' is not a denial of due process.") (citation omitted). Moreover, merely asserting that a state-law error violates the Federal Constitution is not sufficient. *See Wilson v. Corcoran*, 562 U.S. 1, 6 (2010). Nonetheless, habeas relief may be available if an alleged error of state law subjected the petitioner to a "fundamentally unfair" criminal process. *Williams*, 460 F.3d at 816. "[T]he category of infractions that violate fundamental fairness is defined very narrowly," and it includes only state rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007) (cleaned up). "A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (stating that a federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure). The habeas petitioner bears the burden of showing "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Bey*, 500 F.3d at 521.

## DISCUSSION

The State argues Mr. Andrews's first ground for relief is not cognizable on federal habeas review and the second ground is procedurally defaulted. (ECF #6 at PageID 45-52). Mr. Andrews did not submit a memorandum in support of his petition or a traverse in response to the State's return of the writ.

**A.** **Mr. Andrews's first ground for relief is not cognizable in federal habeas corpus review.**

Mr. Andrews's first ground for relief is not cognizable in federal habeas corpus review because it raises an error of state law and Mr. Andrews does not demonstrate how the alleged error denied his federal right to due process. Mr. Andrews argues as follows:

> **GROUND ONE**: I, Wayne Andrews, was denied my right to due process and a fair trial by the admission of unduly prejudicial other acts evidence in violation of the Fifth, Sixth, [and] Fourteenth Amendments of the U.S. [Constitution].

(ECF #1, at PageID 5). Mr. Andrews's argument focuses on whether the trial court improperly applied Ohio evidence law to his trial.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Engle*, 456 U.S. at 121 n.21 ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted). "[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). Consequently, Mr. Andrews's claim, to the extent it challenges the admission of evidence under Ohio law, is not cognizable on habeas review. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Coleman*, 244 F.3d at 542; *Walker*, 703 F.2d at 962. The Sixth Circuit has expressly held that "to the extent that [the petitioner] claims that the trial court's admission of the 'other acts' evidence violated Ohio R. Evid. 404(B), he does not provide a cognizable basis for granting habeas relief." *Bey*, 500 F.3d at 519.

Nonetheless, habeas relief may be available where the alleged error in admitting or excluding evidence is "so egregious that it results in a denial of fundamental fairness" in the trial process. *See Bugh*, 329 F.3d at 512. As Mr. Andrews is proceeding *pro se* and raises his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, I will consider whether the alleged errors of Ohio evidence law denied him fundamental fairness.

"[C]ourts have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993) (cleaned up). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). But "[t]he Supreme Court has cautioned against the wholesale importation of common law and evidentiary rules into the Due Process Clause," no matter how longstanding and widespread these practices may be. *United States v. LeMay*, 260 F.3d at 1024-25 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)); *see also Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983) (noting that "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules"). In these cases, the habeas petitioner bears the burden of showing "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Bey*, 500 F.3d at 521. To the extent Mr. Andrews argues the evidentiary error violates fundamental fairness, he points to the right to a fair trial, a right no one would questions as fundamental. *See id.* But Mr. Andrews offers no argument that the law in question—Ohio Evidence Rule 404(B) and its rules governing admission of other-

acts evidence—violates that right, nor has he presented any Supreme Court precedent contrary to the effectuation of that rule.

The Supreme Court has held that other-acts evidence is admissible in federal court under the Federal Rules of Evidence. S*ee Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988). I note that Ohio Evidence Rule 404(B) and Federal Rule of Evidence 404(b) each govern the admission of other-acts evidence and the two rules are almost identical in language. The Supreme Court has not addressed any potential constitutional implications of other-acts evidence and has expressly avoided doing so. In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior-bad-acts evidence violated due process, thus warranting habeas relief. 502 U.S. at 75. Moreover, in *Spencer v. Texas*, the Supreme Court rejected the argument that the Due Process Clause requires the exclusion of prejudicial evidence, even where limiting instructions were given and a valid state purpose is served. 385 U.S. 554, 563-64 (1967). The Supreme Court recognized in *Spencer* that it was not "a rule-making organ for the promulgation of state rules of criminal procedure. And none of the specific provisions of the Constitution ordains this Court with such authority." *Id.* at 564. The Sixth Circuit has concluded from those cases that admission of other-acts evidence is "not contrary to clearly established Supreme Court precedent" such that habeas relief would be appropriate. *See Bugh*, 329 F.3d at 512 (denying habeas relief where the state trial court admitted other-acts evidence concerning uncharged acts of child molestation by habeas petitioner similar to the charged offense.); *see also Ecker v. Harris*, No. 5:19-CV-01126-JZ, 2022 WL 658821, at *8 (N.D. Ohio Feb. 8, 2022), *report and recommendation adopted*, 2022 WL 657454 (N.D. Ohio Mar. 4, 2022) (because there is no clearly established Supreme Court precedent, the habeas petitioner "cannot,

therefore, demonstrate that the state's evidentiary ruling amounted to a due process violation. Accordingly, this argument is not cognizable on federal habeas review.").

Consequently, Mr. Andrews's first ground for federal habeas relief is not cognizable. To the extent Mr. Andrews argues the state courts erroneously applied state evidence law, the Sixth Circuit has expressly held such a claim is not cognizable. *Bey*, 500 F.3d at 519. To the extent Mr. Andrews argues the alleged evidentiary error deprived him of due process, he offers no argument Ohio Evidence Rule 404(B) and its rules governing admission of other-acts evidence violates that right nor has he presented any basis to conclude the use of the evidence was contrary to or an unreasonable application of Supreme Court precedent. The available Supreme Court precedent has expressly avoided addressing whether other-acts evidence violates due process, and the Sixth Circuit has interpreted those cases that there is no clearly established precedent. *See Bugh*, 329 F.3d at 512.

For these reasons, I recommend the District Court **DISMISS** Mr. Andrews's first ground for relief.

**B.      Mr. Andrews's second ground for relief is procedurally defaulted.**

Mr. Andrews's second ground for relief is procedurally defaulted because it raises a claim that is barred by Ohio's doctrine of res judicata. Mr. Andrews argues as follows:

> **GROUND TWO:** I, Wayne Andrews, was denied my right to due process and a fair trial by the exclusion of evidence of the alleged victim's mental history in violation of the Fifth, Sixth, Fourteenth Amendment to the [United States] Constitution.

(ECF #1 at PageID 7).

As discussed above, a habeas petitioner can procedurally default a claim by not raising the issue before the state courts. *Baston*, 282 F. Supp. 2d at 661 ("Issues not presented at each and

every level [of the state courts] cannot be considered in a federal habeas corpus petition."); *Shinn*, 596 U.S. at 371 (holding a claim is procedurally defaulted on federal habeas review where a state prisoner has failed to first present a federal claim to the state court in accordance with state procedures and the state court would dismiss the claim on that basis). Additionally, in Ohio, the doctrine of res judicata bars review of issues that could have been raised on direct appeal but were not. *Perry*, 226 N.E.2d at 108. The Sixth Circuit has long held that Ohio's doctrine of res judicata is an adequate and independent state procedural ground on which to bar further review of a claim. *See, e.g.*, *Monzo*, 281 F.3d at 577. Mr. Andrews procedurally defaulted his second ground for relief because he failed to raise the issue in his discretionary appeal to the Supreme Court of Ohio.

Mr. Andrews raised Ground Two in his second assignment of error in his direct appeal before the Ninth District. (ECF #6-1 at PageID 257; *see also Andrews*, 2020 WL 2060616, at *9). But when he appealed the Ninth District's judgment to the Supreme Court of Ohio, Mr. Andrews only presented Ground One as a proposition of law; Ground Two was not. (*Id.* at PageID 274). Mr. Andrews was assisted by counsel in preparing his discretionary appeal to the Supreme Court of Ohio and the winnowing down of which issues to raise has long been a strategic decision of appellate advocates. *See Jones v. Barnes*, 463 U.S. 745, 751–52 (1983). Because Mr. Andrews could have presented Ground Two before Supreme Court of Ohio but did not do so, Ohio's doctrine of res judicata bars further review of the issue in Ohio courts. *See Leroy v. Marshall*, 757 F.2d 94 (6th Cir.1985) (habeas review barred by default where petitioner presented claim on direct review to the Court of Appeals, but not to the Supreme Court of Ohio).

Mr. Andrews can overcome this procedural bar by showing (1) cause for the default and (2) actual prejudice as a result of the alleged violation of federal law or that failure to consider the

claims will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 749. He makes no showing as to why he did not pursue the issue before the Supreme Court of Ohio. In his petition, Mr. Andrews denies he defaulted, stating he "exhausted all appeal procedures both direct and state supreme court. I motioned for a new trial but was rejected proceedings." (ECF #1 at PageID 8). My review of the record discloses that the second ground for relief was not presented to the Supreme Court of Ohio and Mr. Andrews does not explain why he did not do so. *See Lundgren*, 440 F.3d at 764 (holding habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced).

Mr. Andrews was assisted by counsel in his appeal to the Supreme Court of Ohio. Ineffective assistance of counsel can constitute "cause" for a procedural default. *Murray*, 477 U.S. at 488. But an ineffective-assistance-of-counsel claim generally constitutes cause only at a stage of the proceedings when the petitioner has a Sixth Amendment right to counsel. *Coleman*, 501 U.S. at 752; *see also Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 433 (6th Cir. 2006). The Sixth Amendment right to appellate counsel "extends to the first appeal of right, and no further." *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Because Mr. Andrews had no constitutional right to counsel in his discretionary appeal to the Supreme Court of Ohio, an ineffective-assistance-of-counsel claim would not be cause for Mr. Andrews's procedural default of Ground Two. *See Wainwright v. Torna*, 455 U.S. 586, 588 (1982) (noting no constitutional right to counsel in pursuing discretionary state appeals). In this situation where there is no constitutional right to counsel, a prisoner "bears the risk in federal habeas for all attorney errors made in the course of the representation." *Coleman*, 501 U.S. at 754.

Mr. Andrews's second ground for relief is procedurally defaulted because he could have raised the issue before the Supreme Court of Ohio but did not do so and he makes no showing of cause for his default or actual prejudice as a result of the alleged error or that failure to consider the second ground for relief will result in a fundamental miscarriage of justice. Consequently, I recommend the District Court **DISMISS** Mr. Andrews's second ground for relief.

### CERTIFICATE OF APPEALABILITY

A habeas petitioner may not appeal the denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability (COA) and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has determined a petitioner's constitutional claim to be without merit, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong" before receiving a COA. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether (1) the petition states a valid claim of the denial of a constitutional right and (2) the district court was correct in its procedural ruling. *Id*. A showing that the appeal would succeed on the claim is not required to grant a COA. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Mr. Andrews has made no substantial showing of the denial of any constitutional right. Jurists of reason would not find it debatable whether the grounds for relief are valid claims of the

denial of constitutional rights. Therefore, I recommend the District Court **DENY** Mr. Andrews a COA.

C<small>ONCLUSION AND</small> R<small>ECOMMENDATION</small>

Mr. Andrews's federal habeas petition raises two grounds for relief, and each should be dismissed. The first ground for relief is not cognizable in federal habeas review because it raises a state-law evidentiary error and to the extent Mr. Andrews raises a due process claim, he has not shown that the alleged error affected the fundamental fairness of his trial. The second ground for relief is procedurally defaulted because Mr. Andrews did not raise the issue in his appeal to the Supreme Court of Ohio and he makes no showing of cause for the default or that prejudice or a miscarriage of justice will result from the court not considering the alleged error. Accordingly, I recommend the District Court **DISMISS** Mr. Andrews's habeas petition and **DENY** him a COA as to both grounds.

Dated: May 24, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

<u>Objections, Review, and Appeal</u>

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl*, **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not**

28

merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).